## THE INHABITANTS OF HALLOWELL
*v.*
## THE INHABITANTS OF GARDINER.

A slave, resident out of his master's family, in a plantation, at the time of its incorporation, gained no settlement by such incorporation.

Neither could the wife, nor the minor children of such slave, gain a settlement, in such case, in their own right.

By the words " *all persons*" in *Stat.* 1793. *ch.* 34. in the *ninth* mode of gaining a settlement, are intended only those persons who are legally capable of gaining a settlement, in their own right, in any *other* mode.

Minor children cannot have a settlement distinct from the father; nor can a wife acquire one separate from her husband.

*Assumpsit* for the support of a pauper alleged to have her legal settlement in *Gardiner.* In a case stated for the opinion of the Court, the following facts were admitted. *Harriet,* the pauper, was the grandchild of *Isaac Hazard Stockbridge* and *Cooper* his wife. *Hazard* was a negro man, imported from *Africa* about the year 1740, when a child, and was claimed as a slave by purchase by *Doctor Sylvester Gardiner,* and as such ever considered himself; and resided with his master, in *Boston,* from the time when he was imported, until about the year 1766. In the year 1765, *Hazard,* with the consent of his master, was legally married to *Cooper Loring,* a free black woman, as far as a marriage between a slave and a free woman can be considered legal. The place of *Cooper's* legal settlement, at the time of this marriage, does not appear.

After the marriage *Hazard* continued in the service of *Dr. Gardiner* and resided in his house as before, for about a year; when being suspected of attempting to set fire to his master's house, he was ordered to repair to an estate of his master in a plantation then called *Gardinerstown,* and afterwards *Pittston,* there to remain till permitted to return to *Boston.* The master of the vessel in which he was transported was charged to deliver him at *Gardinerstown,* which he did; and his wife and children were soon after sent to him. For the first year or two of his banishment *Hazard* resided on the east side of *Kennebec* river, in the service of a tenant of *Dr. Gardiner;* after which, by order of his master, he resided with his wife and

children, among whom was *Lucy Stockbridge*, mother of the pauper, on the west side of the river, now *Gardiner*, on a new farm of *Dr. Gardiner's.*

In the year 1776, *Dr. Gardiner* left the province of *Massachusetts*, to which he never returned. He arrived at *Newport* in the State of *Rhode-Island* in the year 1786, where he died on the eve of his departure for the *Kennebec.* During his absence the *Doctor* intrusted the care of his estates at *Gardinerstown* to his son *William*, who from time to time required the services of *Hazard* upon his father's estate, and frequently furnished him with supplies for his family, until the death of *Hazard* in the year 1780.

The plantation of *Gardinerstown* was incorporated by the name of *Pittston* in the year 1779, *Lucy* being then about ten years of age. About two years after that time, and a year before the death of her mother, *Lucy* went to *Augusta*, where she resided until the year 1792, during which time she became the mother of *Harriet*, the pauper, who is illegitimate. She then returned to that part of *Pittston* which is now *Gardiner*, where she dwelt until the year 1809.

*Pittston* was divided *February* 17, 1803, that part lying on the west side of *Kennebec* river being incorporated by the name of *Gardiner.*

*Bond*, for the plaintiffs.

1. The grandfather of the pauper, though imported a slave, was *emancipated* prior to the incorporation of *Pittston.*

Slavery, in *all* its forms, was never tolerated in *Massachusetts.* It was forbidden by the colony law of 1641, except in certain cases, as capture in war, voluntary servitude, or purchase from another citizen, &c. Ever since that period slavery has been regarded as an evil; and was never recognized expressly from that time till the adoption of the Constitution. In the first article of the bill of rights prefixed to that instrument, it was not intended to set forth new rights, to be enjoyed in time to come; but generally to assert the existence of certain inalienable rights; and among them the right of personal liberty. Slavery, therefore, being but reluctantly tolerated, slight evidence of manumission is sufficient. No deed is necessary; it is enough if the master do any act from which that intent can be fairly infor̄r̄ed̄.

Here the master in 1776, left the slave, and his whole property, and abandoned the country till 1786. It is true he left his estates generally in the care of his son, but he did not specify this slave; and though the son occasionally took notice of him, yet he resided at a distance of two hundred miles, and left him at his own disposal.

The relation of master and servant is reciprocal. The one owes protection, the other service. But here, the master having ceased to protect, the slave was free.

If therefore *Hazard* was free, and resident in the plantation of *Gardinerstown* at the time of its incorporation in 1779, he gained a settlement by the incorporation, both for himself and for the members of his family, of which the mother of the pauper was one; and this settlement was transferred to *Gardiner* by its separation from *Pittston* and its erection into a distinct town in 1803.

*Pittston*, it is true, was incorporated prior to the Statute of 1793. *ch.* 34. which speaks of the effect of residence on a territory incorporated into a town; but that part of the Statute is to be regarded as declaratory, merely, of the law as it had before stood. *Bath v. Bowdoin*, 4 *Mass.* 452. *Buckfield v. Gorham*, 6 *Mass.* 445.

2. Admitting *Hazard* to be *still a slave*. His marriage with *Cooper Loring* was void, for that cause. *Andover v. Canton*, 13 *Mass.* 547. *Middleborough v. Rochester*, 12 *Mass.* 363. A slave has no civil rights, and of course can make no civil contracts,— much less one so solemn as that of marriage. If the marriage was void, then the wife acquired a settlement in *Pittston* by the act of incorporation, which settlement is extended to the children, both by residence on the territory at the time of its incorporation; and by birth, they being illegitimate. But supposing the marriage legal, and *Hazard* still a slave; he could for that reason communicate no settlement to his wife; and therefore she might acquire one herself by the incorporation of *Pittston*.

It may be objected that though the husband could give no settlement to the wife, he being a slave, yet, the marriage being legal, the children could derive none from the mother, because not illegitimate. But if the child could derive no settlement

from either parent, then she might gain one in her own right, though a minor. The Statute of 1793, is universal in its provisions. None are excluded, either by sex or age, who are resident on a territory at the time of its incorporation. And it has been decided in this county,* in the case of *Fairfax v. Vassalborough*, that the Statute applied to a resident *non compos*, who had no parents, and who thus gained a settlement in *Fairfax*.

*Allen*, for the defendants.

Slavery has been recognized as lawful in *Massachusetts*; however dishonourable to the State, or repugnant to our feelings. In this case the ancestor, *Hazard*, continued a slave. There was no express manumission; and the intent of the master was manifestly otherwise. He ordered him to his estate here, and fixed him on his own soil; evidently intending to retain him as a slave, and to prevent him from perpetrating the mischief he had threatened. The *Stat.* 2 *Ann. c.* 2. *Ancient Charters, app. c.* xvii. is a sufficient answer to any argument of implied manumission; it being, by that Statute, expressly forbidden, except upon the execution of a bond of indemnity by the master, which in the present instance was never done.

But though a slave, *Hazard* might lawfully contract marriage, as appears from the Provincial *Stat.* 4 *Ann. c.* 5. *Ancient Charters, app. c.* xix. which forbids any master unreasonably to deny marriage to his negro " with one of the same nation."

The incorporation of *Pittston* has no effect in the present case. —Not on *Hazard*, because he was a slave, and had the settlement of his master. Though the language of *Stat.* 1793. *c.* 34. is broad enough to include slaves, yet it is construed to extend only to persons capable of acquiring a settlement in their own right, which slaves are not supposed to be. *Winchendon v. Hatfield*, 4 *Mass.* 123.—Neither on his *wife*; for she could gain no settlement separate from that of the husband, *Shirley v. Watertown*, 3 *Mass.* 323. even though not warned. *Somerset v.*

* *May term* 1814, *per Sewall* C. J. *Parker, Thacher* and *Dewey* J. There is no record of the judgment in this case, it having been compromised by the parties out of Court, after the opinion given by the Court upon the facts stated; which was agreed at the bar to have been as related by *Mr. Bond*.

Hallowell *v.* Gardiner.

*Dighton,* 12 *Mass.* 383.    And if the wife alone could gain a set-tlement by the incorporation, she could not impart it to the children ; for no children derive their settlement from the mother, except those who are *illegitimate.*   *Andover v. Canton,* 13 *Mass.* 547.   Neither on the *children,* to give them a settle-ment in their own right.—If the law were otherwise, infants, of the tenderest age, might be settled in one place, and their moth-ers in another.   And to fix the settlement of children in a place whence the parents are liable to be removed by process of law, is a rule which ought not to be adopted but upon urgent necessity ;—it is a violation of the best feelings of the heart.

The rule that all persons dwelling in a plantation are *ipso facto* settled there by its incorporation, must of necessity be subject to many exceptions.   A woman, by marriage, takes the settlement of her husband.   But if, before she leave her father's house, the plantation in which he dwelt be incorporated, her husband residing in another town, will it be contended that she thus loses the settlement derived from her husband and ac-quires a separate settlement in her own right ?   The same ab-surd consequences will ensue from a universal application of the rule, if applied to minor children, placed in a plantation at school, at board, or confined by sickness.

It would be a great hardship on the plantation to be thus compelled to adopt the wife and children, the part of the family least productive of any public benefit, without any advantage from the master or father.   The obligation to support paupers is supposed to rest upon services rendered and taxes paid.   But what services could a feme covert and infant children render, or what taxes could they pay ?   The slave was not, and his wife and children could not be assessed.   Children, it is true, acquire a settlement with their father, by incorporation of the plantation in which he dwells ; but they gain it derivatively from him ; on the same principle as if he gained a settlement in any other mode.

Perhaps the soundest construction of the rule is that which has been adopted in relation to the Provincial Statutes of 4 *W. & M. c.* 13. and 12 & 13 *W.* 3. *c.* 10.   *Winchendon v. Hatfield,* 4 *Mass.* 123.   *Ancient Charters, c.* xv. lxxvii. by which slaves, femes covert, and children are excluded.   If there be any dif-

ference in the present instance, it is that they are the wife and children of a slave ; but such persons have certainly no greater privileges than the wives and children of freemen.

*Bond*, in reply.

The case cited in which the wife could gain no settlement apart from her husband, is where all the parties were free. But here one was a slave.

If the child gained no settlement by the incorporation of *Pittston*, she presents a case anomalous and unreasonable. She has no settlement by the father, he being a slave ;—none by the mother, she being lawfully married ;—and none in her own right ;—and yet she is a native of this State.

MELLEN C. J. delivered the opinion of the Court, as follows.

The counsel for the plaintiffs rests his cause on four distinct grounds : and if either of them be substantial the settlement of the pauper and her children must be adjudged to be in the town of *Gardiner*.

The four grounds are these :

1. That *Hazard*, the slave, was manumitted by *Dr. Gardiner*, his master; and thus being free, and residing in a place called *Gardinerstown* in the year 1779, when that plantation was incorporated into a town by the name of *Pittston*, he gained a legal settlement in *Pittston* :—that there was a division of *Pittston* in the year 1803, and that part of the town on the west side of *Kennebec* river was incorporated by the name of *Gardiner ;* and as *Hazard* lived on the west part of *Pittston*, his daughter *Lucy*, the mother of the pauper *Harriet* became legally settled in *Gardiner*.

2. That if *Hazard* were not manumitted as before supposed, the result would be the same, because his marriage with *Cooper Loring* was void.

3. That if the marriage be not void, *Cooper*, the wife, residing in *Pittston* at the time of its incorporation in 1779, gained a settlement there in her own right ; and that from her *Lucy* the daughter, and *Harriet* the grand-daughter have derived their settlements.

4. That if the marriage be not void, and if *Cooper*, the wife of *Hazard*, did not gain a settlement in *Pittston* by residence.

as above supposed, still, her daughter *Lucy* though then a minor of only ten years of age, gained a settlement by her residence in *Pittston* at the time of its incorporation ; and that her settlement is communicated to the pauper *Hárriet* and to her children.

As to the *first* point, we do not perceive any facts which shew that *Dr. Gardiner* ever did, or intended to emancipate his slave. He was placed at *Gardinerstown* under the command of his master ; was in part supported by him ; and was left under the care of an agent, who was directed to require the services of the slave. In this situation he remained when *Dr. Gardiner* himself went to *Europe.* There can be no ground therefore, for presuming an emancipation.

But no manumission of a slave, however express and formal, could be availing, unless a bond of indemnity were given, according to the provisions of the Provincial *Stat. 2 Ann. c. 2. Ancient Charters, app. ch.* xvii. As no such bond of indemnity was given by *Dr. Gardiner* in the case of *Hazard,* the plaintiffs' first ground is not maintained.

As to the *second* point ;—though it is said in the case of *Andover v. Canton* that slaves have no civil rights, except that of protection from cruelty, and can make no contracts for the acquisition or disposal of property without their masters' consent ; still, they have, or at that time had the capacity to make the marriage contract : as minors have, though they are not bound, generally by their other contracts. And lest masters should, from improper motives, undertake to control their slaves in the article of marriage, it is provided by the Provincial *Stat. 4 Ann. c.* 6. cited by the defendants' counsel, that " no master shall " unreasonably deny marriage to his negro with one of the " same nation, any law, usage, or custom to the contrary not- " withstanding." We can perceive no reason, therefore, for pronouncing the marriage void.

The *third* point is of more importance. Could the wife of a *slave* gain a settlement by residence in a town with her husband at the time of its incorporation, though her husband could not ; he being the slave of a master living, and having his settlement, in another town ; and of course being settled in the same town with his master ?

In the case of *Shirley v. Watertown*, 3 *Mass.* 322. it was decided that a wife could not gain a settlement separate from her husband; and of course that a warning of the *husband only*, prevented his wife and child from gaining a settlement. In that case all the persons were free; and the plaintiffs' counsel contends that a distinction between that case and the present arises from that circumstance.

It is true it seems to be settled that a *slave* can neither acquire nor communicate a settlement, like a free man. But still, if the *wife* of a *slave* could gain a settlement in her own right, without her husband, it might lead to a separation of the husband and wife, as effectually as if the wife of a free man could gain a settlement distinct and separate from *her* husband; which, it is admitted cannot be done. In both cases the settlement of the husband might be in one town and that of the wife in another. The free husband could gain a settlement himself and the master of the slave husband would gain or retain one for him. Now as the reason assigned by the Court in the case of *Shirley v. Watertown*, why a wife cannot have a settlement separate from her husband, is, that it would lead to a separation of husband and wife; and the same reason exists with equal force in the present case; we consider the law in both cases to be the same. Therefore the wife of *Hazard could not and did not* gain a settlement in her own right, by her residence with her husband in the town of *Pittston* at the time of its incorporation.

The *last* point for consideration is, whether *Lucy*, the daughter of *Hazard*, being about *ten years old*, and residing with her parents in *Pittston* at the time of its incorporation, did, in virtue of that circumstance, gain a settlement in that town.

If a minor of ten years of age could gain a settlement in such circumstances, the youngest infant could, upon the same principle; because, so long as they remain a part of the family of their parents, there can be no difference with respect to the power of gaining a settlement, between an infant of one year old and one of twenty years. The same principle applies to *children* under these circumstances, as to a *wife*; they cannot have a settlement distinct from their father, nor she from her husband. The reason of the law is the same in both cases; and both these principles are recognized and settled in the case of *Shirley v. Watertown.*

It is true, the language of the second section of *Stat.* 1793. *c.* 34. in the *ninth* mode of gaining a settlement, is general. " *All* " *persons*, citizens as aforesaid, dwelling and having their homes " in any unincorporated place, at the time when the same shall " be incorporated into a town or district, shall thereby gain a " legal settlement therein." And in the cases of *Bath v. Bowdoin*, 4 *Mass.* 452. and *Buckfield v. Gorham*, 6 *Mass.* 445. the Court decided that such incorporation had the same effect before the Statute just mentioned. But notwithstanding the generality of the language—" *all persons*"—the clause must be understood with such limitations as the legislature must have intended;—and they seem to have intended that all persons legally capable of gaining a settlement in any *other* mode, should, *ipso facto*, gain one in the method mentioned in *that* article ; but not, that a married woman, or a slave, should thus obtain a settlement.

Besides, the statute speaks of those *dwelling and having their homes* in such unincorporated place ; implying persons, not under the control of others, but acting from their own volition. This distinction is particularly made by the Court in the case of *Somerset v. Dighton*, 12 *Mass.* 382. in giving a construction to the language of the Provincial *Stat.* 4 *W. & M. c.* 13. and the first section of *Stat.* 1789. *c.* 14. In the latter Statute it is enacted that " *all persons* who, before the 10th day of *April* 1767 re- " sided or dwelt within any town or district in the then Prov- " ince of the *Massachusetts Bay* for the space of one year, not " having been warned to depart therefrom, according to law, " shall be deemed and taken to be inhabitants of the same town " or district, to every intent and purpose." In that case, the pauper, being *eleven years old*, removed from *Dighton* in 1752, into that part of *Swansey* which is now *Somerset*, and had ever since remained there, not having been warned to depart therefrom. It was contended that the pauper had been *emancipated* by her mother ; but the facts did not prove it ; and therefore the Court decided that *such* a residence in *Swansey* did not gain a settlement. She was considered as belonging to her mother's family, and therefore not embraced in the general language of " *all persons.*" In the case at bar, *Lucy* lived *in the family* with her parents at the time of the incorporation, which marked her

unequivocally as not emancipated, and so not capable of gaining a settlement.

If a child, under the age of twenty-one years, living in her father's family in a town one year before the 10th day of *April* 1767, without being warned to depart, could not gain a settlement in such town when the parent gained none; we do not perceive upon what principle *such* child could, in *such* circumstances, gain a settlement by living in a town at the time of its incorporation.

After a careful examination and review of the able arguments on both sides, we are all satisfied that the present action cannot be maintained.

*Plaintiffs Nonsuit.*